Edward A. STEFAN, Jr., John E. Dunn
and The Rusty Nail Inn,
Inc., Plaintiffs,

v.

Robert A. LAURENITIS, Individually and
in his Official Capacity, Marion C. Wysocki, Individually and in her Official
Capacity, The Town of Sunderland, Defendants.

Civ. A. No. 84-0037-F.

United States District Court,
D. Massachusetts.

Sept. 29, 1988.

Robert W. Ritchie, Charles J. DiMare,
Amherst, Mass., for plaintiffs.

Thomas J. Donoghue, Springfield, Mass., for defendants Laurenitis and Wysocki in Official Capacities and Town of Sunderland.

Roger A. Walaszek, Town Counsel, Northampton, Mass., for Town of Sunderland.

Richard M. Howland, Amherst, Mass., for defendant Wysocki.

Archer Battista, Hegarty, Malloy, Sagalyn & Battista, Springfield, Mass., for defendant Laurenitis.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I. INTRODUCTION

Before the Court is plaintiffs' application for attorney's fees filed pursuant to 42 U.S.C. § 1988 which is opposed by the defendant Town of Sunderland. Because the background and facts of the case are crucial to an understanding of this Court's decision, a necessarily lengthy review of the facts and procedural history follows. As an initial matter, however, plaintiffs have requested oral argument on this motion. Because the Court is fully aware of this case—having held hearings on it in the past—and because the record and briefs adequately set forth the issues necessary for a resolution of this motion, the Court decides that a hearing would in no way facilitate the disposition of the present motion and, therefore, denies plaintiffs' request for oral argument.

### II. FACTS

Plaintiffs Edward Stefan and John Dunn were co-owners of an establishment known as the Rusty Nail, Inc. (hereinafter "Rusty Nail" or "the inn"), located in Sunderland, Massachusetts, which is a small farming town. The Rusty Nail was, essentially, a drinking and entertainment establishment visited primarily by students from the nearby University of Massachusetts at Amherst. Defendant Robert Laurenitis is a farmer in Sunderland and was a member of

the Sunderland Board of Selectmen and defendant Marion Wysocki was a member of the Sunderland Board of Health at all times relevant to this case. On November 14, 1982, the day after the busiest night of the year at the Rusty Nail, defendant Wysocki and two other Board of Health members named Leon Dzenis and Aileen McDonnell made unannounced visits to inspect the Rusty Nail. Plaintiffs allege they were rude and belligerent and ordered a cleaning man to show them around the inn. Later that day, Wysocki and Laurenitis returned to the inn for another inspection.

After the surprise inspections, plaintiff Dunn telephoned all three Sunderland Board of Selectmen to complain about the supposedly harassing and belligerent nature of the visits. Pursuant to the advice of two of the selectmen, Dunn presented on November 15, 1982 at a Sunderland Board of Selectmen meeting a formal letter of complaint regarding the inspections. Plaintiff Stefan was also present at this meeting. The letter read:[1]

Dear Town Official:

For the past 11 years I have managed and co-owned a business, the Rusty Nail Inn, and for 6 years I lived in Sunderland. I am very proud of the reputation of that business. Over the past 11 years the Rusty Nail Inn has been routinely and occasionally inspected by several different regulatory agencies—both State and Town. We have had our differences with Boards of selectmen over the years, but have always worked co-operatively to reconcile those differences.

Recently, Marion Wysocki, unannounced, entered my business without permission during non-business hours on three separate occasions on Sunday, November 14, 1982. Several people described her attitude as rude, obnoxious, beligerant, and antagonistic. She made a verbal threat to the manager that she would do all she could to close down the Rusty Nail.

---

1. Misspellings in correspondence between plaintiffs and defendants and in minutes of the Board meetings are so numerous that they have not been noted or corrected by the Court.

She returned later that same day, her *3rd* visit, and proceeded to question the cleaning crew about police assignments at the club, whether the officer on duty on November 13th was checking I.D.'s; she inquired about license status, rooms for rent, food service, capacity, structural design, building inspector's inspection, and several other areas of no official concern to her.

No town or state official has a right to harass or berate employees, insult owners, enter premises illegally, make verbal threats, and behave in a rude and antagonistic manner.

She only identified herself on request as "I *am* the board of health, and I can come in here whenever I want to, and go where ever I want to!"

From her questions she must also assume that she *is* additionally the board of selectmen, the A.B.C.C., the building inspector, and the Chief of Police.

We seek no less than an apology from her and assurance that she will not behave in that manner in any establishment in Sunderland. If there are legitimate problems or concerns about our business operation, we will be pleased to co-operate with any board member or representative directly as we have in the past eleven years.

Thank-you for your courtesy and consideration of this matter.

Sincerely,

John E. Dunn

c.c. Marion Wysocki

c.c. Board of selectmen

c.c. Board of Health

The meeting became quite heated as plaintiffs Stefan and Dunn openly repeated the allegations stated in the letter. Additionally, Stefan claimed that defendant Wysocki conducted the surprise inspections because one of her sons worked for a nightclub in competition with the Rusty Nail and another son unsuccessfully attempted to purchase the establishment. Portions of the minutes of the November 15, 1982 meeting read:

Ed Stephan and John Dunn came before the Board complaining about the way the Board of Health handled their inspection of the Rusty Nail. Mr. Dunn gave the Selectmen a letter, copies of which were sent to the Board of Health and Marion Wysocki, complaining about the manner in which Mrs. Wysocki and the Board of Health inspected the Rusty Nail.

Robert Laurenitis: The letter is very strong and full of discrepancies. I feel sorry for you people.

Ed Stephan: Why did Marion come in three times, once with Mr. Laurneitis? The only reason she's complianing is because her son works for Hangar One and they wanted the same band we got and couldn't get it because we did.

Laurenitis: You should really get down to business with her and not bother us with all this.

Aileen O'Donnell: We've been regularly visiting establishments and you are the last one. We came at 11:00 and were told to come back at 1:00 and someone would be there to let us in.

Stephan: Why wasn't I notified. The place was closed.

Marion Wysocki and O'Donnell: You don't need to be.

Leon Dzenis: We came Sunday at 1:30 or 2:00 and waited until we were let in. The help was concerned about the mess because of a big party the night before. We've gone everywhere. There have been no problems or complaints about our inspections untill we went to the Rusty Nail.

Stephan: You could have come when we were open or inform me and I will take you around. We don't open on Sunday untill 7:00.

Dzenis: We've been places where the help has taken us around. We didn't think it posed a problem.

Wysocki: Your letter is emotional and erroneous. I didn't enter at 11:00 and the help took us around and offered to tell us everything like there were 800 people there.

Stephan: It's none of your business to check on the police or how many customers enter.

Dzenis: We'll give you a fair shake.

Stephan: Why did she say she will close us down?

Wysocki: I never said that. Someone said they were going to close down for a while to fix things up.

John Dunn: I've taken notarized statements from three people there about what you said.

Wysocki: There were not three people there. I only saw one.

Laurenitis: I saw three people. As far as your place being an Inn, you must live up to your contract. I won't have any more outbursts either. Appologize to everyone or I won't sign your license this year.

Dunn: Why did she lie to get in? Why did she say she ran out of gas and must use a phone?

Korpita: How many other establishments did you bring before the Selectmen?

Dzenis: None. We wanted the Selectmen to go to the place before their license was renewed.

Wysocki: We just wanted one Selectmen to see what we saw. And I did run out of gas!

Stephan: Why didn't I get the courtesy of a phone call before you came in? We're not open to the public untill 7:00 pm. Why did you come three times without calling?

Laurenitis: I was called and asked if I wanted to see something extraordinary.

Wysocki: I went with three others and the little fellow offered us the information.

Stephan: I am in conflict with two of Mrs. Wysocki's sons. One is trying to buy my place and the other is working for Hangar One, my competition. And I will never sell to him, Marion!

Laurenitis: Go to a Board of Health meeting if you want to yell at Marion. How can you be an Inn with no rooms to rent or food? Don't you have 18 and 19 year olds in there?

Dunn: We have three rooms, two are rented and one is left to rent. We send out for food when it's needed or wanted usually from Bubs Bar–B–Q because we don't have the personell to cook it. 18 and 19 year olds in our place is legal as long as they don't drink and they are constantly checked.

Stephan: You're vendetta against the Chief is what this is all about. How long has Marion been working for you?

Laurenitis: (at this point the gavel was brought down and Mr. Laurneitis asked officer Matuszko to escort Mr. Stephan out of the Hall).

Dunn: Why was Mrs. Wysocki asking questions not pertaining to the Board of Health? I'm proud of my business.

Laurenitis: If you're proud of it, fix it up.

Dunn: We are little by little. We have 1000 people a week in that place. Once the bars, tables and glasses are clean after a big night, we leave the rest till later.

Laurenitis: What is your legal capacity?

Dunn: 600. It's the responsibility of the State Building Inspector to check.

Laurenitis: Have you ever had a raid like the Seven O's where 50 police came in to count the number of people?

Dunn: The State Police and ABCC have inspected us. The last inspection was about two years ago.

Laurenitis: Maybe on a busy night our chief should count heads? Why are there police on duty now, when a while ago you went for a couple months without them?

Dunn: Fine, as long as he doesn't interfere with out business. During the summers and December we don't need the police, but when school is back in we do. We use them on Friday and Saturday and occassionally on a week day if something is scheduled.

Laurenitis: You should have gone to the Board of Health with your complaint. Withdraw your letter or we will have a different view of you.

Korpita: Don't say we. Speak for yourself. Paul Hodgkins and myself don't necessarily agree with you.

Dunn: I spoke to my attorney about this and read him the letter. I told him we just want to be treated fairly as we have been in the past ten years.

Laurenitis: You've had a lot of protection. You got Paul (Korpita) in office, and Charlie's (Smiarowski) brother-in-law got you your 2:00 license.

Dunn: When I bought the club we had an Innkeepers license and a 2:00 license. It was brought down to 1:00. Then it was brought back up to 2:00. I really hope all this ends here. I hope the Board of Health will tell us what's wrong and give us a reasonable time to fix the problems.

Dzenis: We haven't written anything up on paper. We try to give everyone a fair shake.

Laurenitis: Kevin said he is the manager, but he isn't listed on the license. Shouldn't he be?

Dunn: No. Mr. Stephan makes all the decisions even though Kevin is there during more bar hours.

Dzenis: We just wanted some of the Selectmen's time to tell them to visit the establishments before re-issuing any licenses.

Before this meeting, and later, questions arose regarding the Rusty Nail's status as an "inn" under Massachusetts law. It was doubted by Laurenitis that the Rusty Nail qualified as an inn under Massachusetts law because of the requirements to provide food for and rent rooms to strangers. This status was important because the Rusty Nail served alcohol under a Massachusetts innholders' license. Consequently, at the December 13, 1982 Board of Selectmen meeting:

Ed Stefan came to the Board meeting as per the request of Mr. Laurenitis. Mr. Laurenitis claimed he is not operating an inn and should not have an Innholders license and he would not sign that license unless Mr. Stefan would change to an appropriate license or have ABCC come down. Attorney Pepyne recommended that the Board renew Mr. Stefan's license at the present time and discuss a different and appropriate license throughout next year. Mr. Stefan agreed to have ABCC come down and asked Mr. Laurenitis if he would sign the license. Mr. Laurenitis said he would; Mr. Stefan gave the secretary his certified check for $1000.00; the secretary gave Mr. Laurenitis the license to sign. Mr. Laurenitis then said he would sign the license tomorrow after he called ABCC and the check and license process was reversed. Then Mr. Laurenitis decided he would write to ABCC. At that point Mr. Stefan asked him if he would sign his license because he is going away for the Christmas holidays and would like to take care of everything before he leaves. Mr. Laurenitis said he wouldn't hold up the license.

The next day, Laurenitis changed his mind and stated he would not sign the renewal until he had spoken with someone at the Alcoholic Beverage Control Commission ("ABCC") to resolve the status of the Rusty Nail.

Laurenitis signed the liquor license renewal sometime before January 1, 1983, meaning that at no time was the Rusty Nail operating without a liquor license. Plaintiffs state that Laurenitis' delay in renewing the license was in violation of Massachusetts law. In a letter written by Richard Bishop from the State Department of Public Health to the Sunderland Board of Health dated January 18, 1983, appears the following:

Gentlemen:

On January 10, 1983 this Department, at your request, conducted a joint inspection of the dwelling units at the Rusty Nail Inn on Route 47 in Sunderland. The inspection was performed in accordance with 105 CMR 410.000 State Sanitary Code, Chapter II Minimum Standards of Fitness for Human Habitation.

. . . .

Regarding your question about the proper classification of the living area of the Rusty Nail, it is the opinion of this Department that under Chapter 140, sections 5 and 6 of the Mass. General Laws, the living area does not qualify as an "Inn." It would be more appropriate to

'classify it under Chapter 140, section 22, as a Lodging House or as a Rooming House.

If you have any questions, please don't hesitate to contact this office.

Sincerely,

Robert P. Bishop

District Sanitarian

The State Department of Public Health's opinion regarding the status of the Rusty Nail was later corroborated by the ABCC. In a letter to the Sunderland Board of Selectmen dated November 25, 1983, the ABCC wrote:

In response to your letter of November 16, 1983, it appears that your proposed solution to your obvious dilemma regarding the nature of the operation of the "Rusty Nail Inn, Inc." by offering the license holder a general-on-premise license in exchange for its alcoholic beverages Innholder's license would be, at least, a generous concession on your part.

Particularly, since it is within your power, and responsibility, to determine whether the licensee is in fact properly exercising the privileges of its innholder's license granted under the terms of Chapter 140 of the Massachusetts General Laws, and, therefore, adequately accommodating strangers and travelers.

You are the sole authority with respect to the issue of said license. See Sections 2, 5, 6, 7 and 9 of Chapter 140 with respect thereto. You, therefore, may bring the licensee before your board at a public hearing to answer charges that it is violating any conditions of said license. And if the evidence presented at the hearing supports such charges, you may impose appropriate sanctions against the licensee, including revocation of said license.

It follows, then, that the loss or suspension of its Chapter 140 Innholder's license would disqualify the licensee from holding its Chapter 138, alcoholic beverages Inn license for the sale, etc. of alcoholic beverages therein.

It might be appropriate, therefore, for you to advise the licensee accordingly:

And, that unless he upgrades his operation to meet the requirements outlined in Chapter 140 and 138, its present licenses will be in jeopardy.

At the January 31, 1983 Board of Selectmen meeting:

Mr. Laurenitis brought up the need to hold a hearing to change the Rusty Nail's license from Innkeepers to General on Premise, based on the Selectmen's copy of a letter sent to Sunderland's Board of Health from the State Department of Public Health stating the living area in the Rusty Nail does not qualify as an "Inn." After much discussion between Mr. Laurenitis and Mr. Korpita, Mr. Laurenitis said he was willing to wait another week or two on this subject.

Later, at the February 22, 1983 meeting:

Mr. Laurenitis asked the Board of Health to help the Selectmen with the decision as to whether or not the Rusty Nail is an eating place. Leon Dzenis said the Board of Health would meet with Ed Stefan and get back to the Selectmen. Mr. Laurenitis also expressed concern that people already under the influence were being let into the Rusty Nail and that because of its' capacity, people under age were drinking alcoholic beverages without police or owner's knowledge. He brought this concern to Officer Heller's attention. They both thought perhaps only persons 20 years or older should be allowed into the Rusty Nail but are not sure if that can be done.

Later, partially due to his perception that the Rusty Nail was serving alcohol to underage patrons, causing disturbances in the town, Laurenitis investigated the possibility of overcrowding and the serving of alcohol to minors at the Rusty Nail and sought to have the town close all bars on Sunday mornings at 1:00 a.m. rather than at 2:00 a.m.

At the October 17, 1983 Board of Selectmen meeting:

Laurenitis asked [Police Chief] Heim how he felt about the 2:00 AM closing time for liquor licensed establishments as opposed to a 1:00 AM closing time. Heim stated that he was personally for a 1:00

AM closing based on what effect a roll back of hours had in Mashpee (ie: fewer accidents, fewer DWI arrests). The Board agreed this was food for thought for the future. Laurenitis also brought up sectioning buildings for drinking age and under drinking age patrons. The Board realized if there was a Town By-Law stating that buildings must be partitioned for the two age groups, it would be the Town's responsibility via the Police to make sure the By-Law is upheld. The petition circulated by Ed Stefan regarding the revokation of Section 33A of Chapter 138 of the General Laws along with pertinent information is to be sent to Town Counsel.

Accordingly, in the spring of 1983, the town voted—much to plaintiffs' chagrin—to rescind the authority of the Board of Selectmen, Mass.Gen. Laws ch. 138, § 33A, to grant licenses to sell liquor between the hours of 1:00 a.m. and 2:00 a.m. on Sundays. The Rusty Nail and another town bar known as the Seven O's were the only liquor licensees affected by this decision.

After this, the Rusty Nail was inspected often for possible violations of the health code.

Based on the above, plaintiffs filed an eight-count complaint in this Court alleging violations of the United States Constitution and state tort law. Count one alleges that the defendants conspired to and individually violated plaintiffs' right to petition the government for redress; to associate with political candidates; and to be free from retaliation due to the fact that the Rusty Nail is an inn providing entertainment catering largely to students and ethnic minorities in violation of 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988 and Mass.Gen. Laws ch. 12, § 11I. Count two states that defendants conspired to and individually denied plaintiffs' equal protection of the law by singling them out for inspections without prior notice in violation of 42 U.S.C. §§ 1983, 1985, 1986 and 1988 and Mass. Gen. Laws ch. 12, § 11I. Count three charges that defendants conspired in violation of 42 U.S.C. § 1981 to deprive plaintiffs of a host of fourteenth amendment rights. Count four alleges defendants sep-arately and in concert violated the Massachusetts State Civil Rights Act, Mass.Gen. Laws ch. 12, § 11I by violating state laws. Counts five through eight charge violations of Massachusetts state torts, including interference with advantageous relations, abuse of process, slander and intentional infliction of emotional distress.

Plaintiffs sought as relief in the complaint a preliminary and permanent injunction regarding inspections of the Rusty Nail; $75,000 in punitive damages from each individual defendant; $800,000 in compensatory damages from each defendant; and attorney's fees.

On May 22, 1984, this Court held a hearing on plaintiffs' motion for a preliminary injunction. Recognizing a lack of factual support for plaintiffs' federal civil rights allegations, the Court ordered the parties to submit additional briefing regarding the likelihood of success on the merits of their claims. These briefs were filed. After making initial findings of facts, the Court in a written decision, denied plaintiffs' motion for a preliminary injunction. In so doing, the Court addressed each of plaintiffs' federal civil rights claims and found that plaintiffs had completely failed to come forth with evidence to support their claims of civil rights violations. *See* Opinion denying plaintiffs' motion for a preliminary injunction, dated July 23, 1984. For the next year and a half, the parties were engaged in discovery. Pre-trial conferences were held before a United States magistrate and the trial was set for May 6, 1988.

Shortly before the trial commenced, the parties deluged the Court with cross-motions for summary judgment and cross-motions for Rule 11 sanctions. At a pre-trial hearing, the Court summarily denied all outstanding motions noting it was far too late to expect serious consideration from the Court on these matters. Additionally, the deadlines for filing these type of motions had long since expired. At this hearing, the Court also told counsel that it considered it unfortunate that this case—involving, essentially, no more than a small

town political dispute—found its way into federal court. Upon hearing that counsel needed two weeks to try the case, the Court strongly urged the parties to settle the case. *See* Transcript, May 2, 1988 Pretrial Conference.

The parties entered into negotiations and the town made the following offer:

Pursuant to Rule 68 of the Federal Rules of Civil Procedure, Defendant, Town of Sunderland, hereby offers to allow judgment to be taken against it in this action in the amount of TEN THOUSAND ($10,000) DOLLARS. This offer of judgment is made for the purposes specified in Rule 68, and is not to be construed either as an admission that the Defendant, Town of Sunderland, is liable in this action, or that the Plaintiffs have suffered any damage.

On May 4, 1988, plaintiffs accepted this offer and, further, settled the case with defendants Wysocki and Laurenitis for $3,000.00 each. Accordingly, the Court dismissed defendants Wysocki and Laurenitis from the case with prejudice and entered judgment for plaintiffs against the Town.

On June 8, 1988, this Court received plaintiffs' motion for an award of attorney's fees and costs in which counsel seek the amount of $63,228.52, representing all of their efforts and costs in prosecuting this matter. The Town of Sunderland has objected, claiming plaintiffs are not prevailing parties in this case and, if they are, they are not entitled to such a large award. The Court will now rule on the motion.

## III. DISCUSSION

Section 1988 of Title 42 of the United States Code states that in any civil rights action the district court "in its discretion," may allow the prevailing party a reasonable attorney's fee as part of the cost. While the statute allows the district court to exercise discretion in awarding the fee, such discretion is extremely narrow with the rule being that fees should be denied prevailing parties only in the rare situation where there are special circumstances which would render an award unjust. *See Ackerley Communications v. City of Sa-*

*lem,* 752 F.2d 1394, 1396 (9th Cir.1985), *cert. denied sub nom.* 472 U.S. 1028, 105 S.Ct. 3503, 87 L.Ed.2d 634; *Burke v. Guiney,* 700 F.2d 767, 771 (1st Cir.1983).

As the Court views the present motion, there are two issues to be decided. The first is whether the plaintiffs are "prevailing parties" under 42 U.S.C. § 1988 as the term has been defined and interpreted by the courts. Second, if so, whether there are special circumstances which would nonetheless render a fees award unjust in this case.

### A. Prevailing Party Status

■ To begin with, the legislative history of amendments to 42 U.S.C. § 1988 makes it clear that plaintiffs may be considered prevailing even though they fail to obtain all of the relief requested in the complaint. *See* S.Rep. No. 94–1011, 5, U.S. Cong. & Admin. News, 5908, 5912 (1976). Furthermore, plaintiffs who settle their case before trial may be deemed prevailing parties under 42 U.S.C. § 1988. *See Maher v. Gagne,* 448 U.S. 122, 132, 100 S.Ct. 2570, 2576, 65 L.Ed.2d 653 (1980). Yet, just because a plaintiff obtains a settlement in a civil rights case does not automatically transform them into prevailing parties. Rather, courts must analyze the case according to certain standards.

#### 1. The Merits Test

In *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978), the First Circuit crafted alternative tests now being used by many circuits and approved by the Supreme Court to determine whether one is a prevailing party and entitled to counsel fees under 42 U.S.C. § 1988. While the facts in *Nadeau* were somewhat different from those in the present case (*Nadeau* involved a consent decree between inmates and prison officials rather than a monetary settlement), the language used by the court is instructive in this case. The test relevant to this proceeding has recently been labeled by the First Circuit as the "merits test" and is as follows:

Under the first *Nadeau* test, the merits test,

plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.

*Exeter–West Greenwich Regional School District v. Pontarelli,* 788 F.2d 47, 50 (1st Cir.1986) (citing *Nadeau v. Helgemoe,* 581 F.2d at 278–79).

### 2. Applying the Merits Test

Determining plaintiffs' success requires an examination of the benefits sought in the complaint as compared to those actually obtained by the settlement. Plaintiffs in this case sought two major forms of relief —injunctive and monetary—for perceived violations of a number of civil rights.

#### a) Injunctive Relief

The injunction requested by plaintiff was a major part of this litigation. Plaintiffs complained their civil rights were routinely being violated by defendants through unnecessary inspections at the Rusty Nail. Accordingly, plaintiffs sought both a temporary and permanent injunction dictating when and how defendants could conduct future inspections. At a hearing on the motion, and as mentioned above, the Court recognized the seriousness of plaintiffs' allegations yet perceived an absence of factual support therefor. After reading the requested supplemental briefs on the issue of likelihood of success on the merits of the case, the Court remained unimpressed with plaintiffs' evidence. Noting the possibility of a violation of state tort law, the Court remarked:

> The Court does not condone the defendants' behavior. Plaintiffs might ultimately succeed in proving that the officials' actions were tortious in common law; but not every tortious act rises to the level of a constitutional tort.... Plaintiffs have not demonstrated the likelihood of success on their First Amendment claim, nor have they produced evidence of irreparable harm to their business or to the constitutional freedom they assert.

*See* July 23, 1984 Opinion denying plaintiffs' motion for a preliminary injunction.

Applying the merits test, the Court finds plaintiffs failed to achieve any success on the injunction portion of the case.

#### b) Monetary Relief

While most every tort complaint has inflated monetary requests, the type and amount of damages sought by plaintiffs must be reviewed in order to assess plaintiffs' success under the merits test.

In their complaint, plaintiffs requested $800,000 in compensatory damages from the defendants and $75,000 in punitive damages against defendants Wysocki and Laurenitis. The week before trial, the Court held hearings which included a settlement conference with counsel for all parties present. At these hearings, the Court informed plaintiffs' counsel that it considered it unlikely that they would prevail and that, even if they did, they would probably not recover much in the way of damages. The issue of attorney's fees became the sticking point in these negotiations as evidenced in the transcripts of these hearings. *See* Transcripts of May 2, 1988 and May 5, 1988 hearings.

Eventually, the parties were finally able to resolve the case. In return for a voluntary dismissal with prejudice of the claims against them, defendants Wysocki and Laurenitis settled the case by each agreeing to give plaintiffs $3,000 which, in all likelihood, will be reimbursed by the town or its insurance carrier.[2] The town made a $10,000 offer of judgment which was accepted by plaintiffs and has been set forth previously in this Memorandum and Order. It is important to note, however, that one of the terms of the offer was that it would in no way be treated as an admission of liability by the town.[3] Thus, all tolled,

---

**2.** Plaintiffs do not seek attorney's fees from the individual defendants. In their fee application, they state that they are only requesting attorney's fees against the Town of Sunderland.

**3.** The offer of judgment in the present case is strikingly similar to that in *Pigeaud v. McLaren,* 699 F.2d 401, 402 (7th Cir.1983), where the Seventh Circuit held that plaintiff could not be considered a prevailing party because the offer

plaintiffs' million dollar lawsuit settled for a total of $16,000 against all three defendants.

■ While courts should not deny plaintiffs prevailing party status merely because they received a sum of money far less than the amount sought in the complaint, the size of the settlement must at least be a factor to be considered in determining if a settling plaintiff is a "prevailing party" under the merits test.[4]

Now, the Court does not consider $16,000 to be an insignificant amount of money; even by today's standards it is a substantial sum. When one considers the proceedings and history of the case leading up to the settlement, however, the figure becomes, contextually, far less significant. In fact, considering the lack of factual support for plaintiffs' case relating to the constitutional claims, in addition to the relatively small recovery, the Court deems the agreement between the town and plaintiffs an example of a "nuisance settlement," which is a term used by some courts to describe situations where courts have deemed inappropriate an award of attorney's fees in cases which settle.[5]

■ In sum on this issue, the Court has applied the merits test by weighing the benefits sought by the plaintiffs against the recovery obtained and concludes that plaintiffs have not succeeded on any significant issue as the result of the settlement

for the following reasons: 1) plaintiffs' federal claims, if pursued, would have been substantially groundless and unsupported in the record; 2) there has been no judicial decision in favor of plaintiffs on claims necessary to obtaining attorney's fees under 42 U.S.C. § 1988; 3) the Court entirely denied plaintiffs' injunctive relief request long ago noting an absence of factual support for their blanket-like civil rights claims; 4) the accepted Rule 68 offer of judgment expressly states that there was no admission of liability; and 5) the amount of the "nuisance settlement" is minor when compared to the type and extent of damages sought by the plaintiffs. For these reasons, plaintiffs have flunked the merits test and are not prevailing parties under 42 U.S.C. § 1988. Also, since the definition of prevailing party is the same under both federal and state law, the Court holds plaintiffs are not entitled to attorney's fees under Mass.Gen. Law ch. 12, § 11I. *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 473 N.E.2d 1128, 1130 (1985).

### B. Special Circumstances

As an alternative holding, the Court decides that even if plaintiffs are prevailing parties under 42 U.S.C. § 1988, there are nevertheless "special circumstances" present justifying the denial of plaintiffs' fees request under this Court's discretionary powers within the statute.[6]

of judgment expressly stated that nothing therein would be construed as an admission of liability by the defendants. *Id.*

4. Trial courts in some cases have improperly denied plaintiffs prevailing party status solely because a jury, after rendering a decision in their favor, awarded them minimal or nominal damages. *See, e.g., Skoda v. Fontani*, 646 F.2d 1193, 1194 (7th Cir.1981). In a case such as this, however, the absence of a verdict in plaintiffs' favor renders the amount of the settlement an appropriate factor in answering the question of whether plaintiffs are prevailing parties.

5. *See, e.g., Gram v. Bank of Louisiana*, 691 F.2d 728, 730 (5th Cir.1982); *Chicano Police Officers Association v. Stover*, 624 F.2d 127, 131 (10th Cir.1980); *Forrest v. New York City Criminal Justice Agency*, 549 F. Supp. 211, 212 (S.D.N.Y. 1982).

The Third Circuit has recently rejected use of this term in deciding whether one is a prevail-

ing party in attorney's fees cases. *See Ashley v. Atlantic Richfield Company*, 794 F.2d 128, 131–32 (3d Cir.1986). The present decision does not conflict with *Ashley* because the Court is not denying plaintiffs' prevailing party status solely because it deems the parties' agreement a nuisance settlement. Rather, the Court uses this term merely to describe its characterization of the nature of the settlement as one of the many factors it considered in reaching its conclusion. Nor is this Court focusing on the town's motivation in settling the lawsuit. *Id.* at 134 n. 9. The appropriate focus at all times must be, and is, on assessing plaintiffs' success with respect to the benefits sought. *See Nadeau*, 581 F.2d at 278–79.

6. In their fee petition, plaintiffs assert that this Court indicated on the record that it would award attorney's fees. They are mistaken and take the Court's statements out of context. It is clear from a reading of the relevant transcripts

As an initial matter, the Court recognizes and respects the rule of thumb that a prevailing civil rights party is ordinarily entitled to recover attorney's fees and that the discretion mentioned in 42 U.S.C. § 1988 is exceedingly narrow such that fees should be awarded unless special circumstances are present which would render the award unjust. *See Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983); *Burke v. Guiney,* 700 F.2d at 772. Nevertheless, after much consideration, the Court finds that this case falls within that minute class of cases where those special circumstances are present warranting a denial of fees in this case. An explanation follows.

■ While the First Circuit has identified factors to consider in determining if there are special circumstances in fees cases, the court has not developed standards to apply for deciding such cases. *See, e.g., Burke v. Guiney,* 700 F.2d at 772–73. The Ninth Circuit, however, has identified two factors as dispositive of the issue which this Court finds useful. In *Seattle School District No. 1 v. State of Washington,* 633 F.2d 1338 (9th Cir.1980), *aff'd,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed. 2d 896 (1982), the court wrote:

> Our Court has examined two factors in determining if a case involves "special circumstances" which would make an award "unjust": (1) whether allowing attorney's fees in a particular case would further the congressional purpose in adopting the Acts, and (2) the balance of equities.

*Id.* at 1348 (citations omitted). Both questions will be addressed.

1. Congressional Purpose

■ In codifying 42 U.S.C. § 1988, Congress sought to encourage competent counsel to further the rights of the oppressed by representing them in court with the confidence that, if they prevailed, they would be compensated for their efforts regardless of the financial stature of their clients. *See Kerr v. Quinn,* 692 F.2d 875, 877 (2d Cir.1982). This beneficial and well-suited statute serves its purposes well. Many civil rights violations, which would otherwise go unpunished, are being vindicated in federal courts primarily because of the statute.[7] Yet, the potential for abuse and manipulation is indeed present. This Court has witnessed an explosion of unsupportable and frivolous 42 U.S.C. § 1983 suits in addition to cases where counsel attempt to cloak a violation of state law in the robes of a federal civil rights violation in hopes of recovering their fees. As previous courts have stated, an award of attorney's fees in a civil rights case must not be such as to encourage the overpressing of marginal claims. *See Greenside v. Ariyoshi,* 526 F.Supp. 1194, 1197 (D.Haw.1981); *Nash v. Reedel,* 86 F.R.D. 16 (E.D.Pa.1980). The result of all this is that the courts are the ones who must filter out spurious cases. And, although there exist various sanctioning mechanisms which courts can use to deter counsel from pursuing these types of suits, this Court, at least, is hesitant to impose sanctions unless it is virtually sure that the suit is frivolous—which is something that rarely occurs.

With the purposes of the relevant statute identified, and with the practical problems in analyzing fee applications in mind, the Court now turns to the present case.

The allegations raised in the complaint are serious and cut right to the heart of our civil rights laws. Plaintiffs charge in counts one, two and three that the defend-

---

that the Court's remarks relating to attorney's fees were only that counsels' fees requests were high and that they should accept a lower figure rather than have the case go to trial solely because counsel could not resolve the fees issue on their own. *See* May 2 and May 5, 1988 transcripts.

**7.** This Court has previously awarded high counsel fees in civil rights suits. For example, this Court recently awarded $115,866.50 in attor-

ney's fees under 42 U.S.C. § 1988 to plaintiffs who were successful in their civil rights action. *See Wagenmann v. Pozzi,* C.A. 79–1658–F [available on WESTLAW, 1986 WL 715], *aff'd and remanded on different grounds,* 829 F.2d 196 (1st Cir.1987). In fact, this Court has never denied a prevailing party counsel fees in a civil rights case. The Court adds this remark merely to dispel possible notions that it is unduly harsh in applying 42 U.S.C. § 1988.

ants individually and in conspiracy, violated their first and fourteenth amendment rights including 1) the right to be free from retaliation due to the fact that they ran an establishment catering largely to ethnic and racial minorities; 2) the right to associate with chosen political candidates and groups; and 3) the right to petition the government for redress of grievances, in violation of 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988. The remaining counts allege violations of state law, to wit: violations of the Massachusetts Civil Rights Act, interference with advantageous relations, slander, and intentional infliction of emotional distress.

Unfortunately for plaintiffs, it became clear to the Court as the case unraveled that the federal allegations were more contrived by clever counsel than grounded upon sound facts. For example, 42 U.S.C. §§ 1981, 1985 and 1986 require proof of racial or class-based invidious discrimination. *See General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Nothing observed by the Court after a thorough review of the record or disclosed during the history of the case even hints of racial or class-based discrimination. Rather, it is clear that counsel attempted to paint a fictitious picture by inserting an entirely meritless racial element into this case. Manipulating and subverting civil rights laws is not to be rewarded. This is not, and has never been, a racial or class-based discrimination case; it is a small town political dispute which has sadly been dressed up and pursued in federal court.

This leads the Court into plaintiffs' only arguable constitutional claim. It is true that during the November 15, 1982 Sunderland town meeting plaintiff Stefan was

ejected. From this, plaintiff Stefan charges a trio of first amendment violations. Yet, a reading of the minutes of this proceeding shows that Mr. Stefan was shown the door only after he had commenced personally attacking the individual defendants by accusing them of conspiring against him to carry out personal vendettas. These allegations clearly transgress the limits of properly aired grievances to inappropriate conduct.[8] In any event, Stefan was given an initial opportunity to address the Board, yet abused this privilege and consequently was ejected.

As this Court opined in its Opinion denying plaintiffs' request for an injunction, the defendants' acts, overall, are not to be condoned and, may even rise to the level of a tort under state law. Yet, the evidence here came nowhere close to establishing the type of civil rights violations alleged in the complaint. To charge defendants with attorney's fees in this case would constitute a windfall to plaintiffs' counsel.

In sum on this first issue, allowing plaintiffs' motion for an award of attorney's fees in this case would in no way further the legislative purposes of 42 U.S.C. §§ 1981, 1983, 1985, 1986 or 1988.

2. Balancing the Equities

A balancing of the equities identified by the Court strongly militate against awarding counsel fees in this case.

First, as mentioned in previous sections of this Memorandum and Order, plaintiffs did not obtain success on any significant issue in this case. They failed to have an injunction issued and they failed to come forth with factual support on virtually all of their constitutional charges including racial or class-based discrimination and an equal protection violation. The only relief

---

**8.** While plaintiffs did allege a violation of their first amendment right to petition the government for redress, their complaint does not include a count for violation of pure free speech. Nevertheless, however close to, or minimally supportive of, a first amendment violation, Mass.Gen. Laws ch. 39, § 17 reads:

No person shall address a town meeting without leave of the moderator, and all persons shall, at the request of the moderator, be silent. If a person, after warning from the moderator, persists in disorderly behavior, the moderator may order him to withdraw from the meeting, and, if he does not withdraw, may order a constable or any other person to remove him and confine him in some convenient place until the meeting is adjourned.

**1342**

they got was a contextually minimal settlement. It would be unjust to allow fees in this suit which borders on being frivolous insofar as the federal constitutional claims are concerned.[9]

Also, while not a dispositive issue, there is no evidence of bad faith on the part of the Town of Sunderland. *See Burke v. Guiney,* 700 F.2d at 772–73. Stripped to its essentials, this case involves personality disputes between plaintiffs and one member of the Board of Health and one member of the Board of Selectmen. For some unknown reason, defendants never timely moved for summary judgment alleging an absence of factual support for the complaint, a good faith defense, or absolute or qualified immunity. Such a motion would, in all likelihood, have been granted and that would have ended the matter. And, even were there wrongdoings on the part of the individual defendants, the town is not liable merely for employing tortfeasors. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 477–81, 106 S.Ct. 1292, 1297–99, 89 L.Ed.2d 452 (1986). Rather, a municipality becomes potentially liable under 42 U.S.C. § 1983 only where the constitutional violations are undertaken according to official municipal policy. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The Court finds no evidence in this case of such a municipal policy.

■ Finally, a fees award in this case would send out a dangerously wrong message. In ordinary cases where there is no fees statute, prudent counsel in a situation like the present case would have recognized the futility of their case in federal court when they received the court's opinion denying the motion for an injunction and ceased the litigation (assuming no new evidence came to light). Yet, because they are armed with 42 U.S.C. § 1988, counsel in some situations—albeit rare—use the statute as a weapon and forge ahead with their case knowing that if they are able to obtain the barest of settlements, they can seek to have their *entire* bill paid by the defendants. Awarding fees to plaintiffs in this case would pervert the proper purposes of 42 U.S.C. § 1988. Rather than encouraging the filing of baseless federal civil rights suits, the Court seeks to discourage these suits by denying plaintiffs' fees in this case.

Nothing in this Memorandum and Order should be taken as an indication that this Court is not receptive to civil rights suits. To the contrary, such suits vindicate the violations of important and dearly held civil rights, which have become the hallmark of the federal courts. It is the filing of suits such as this, where there is little factual support for broad civil rights *allegations,* which the Court seeks to discourage. Such suits take a great deal of the Court's time which could be better spent addressing meritorious civil rights suits.

## IV. CONCLUSION

To review, the Court finds plaintiffs are not prevailing parties and thus DENIES plaintiffs' motion for an award of attorneys' fees in this case. In the alternative, the Court exercises its limited discretion and DENIES such motion.[10]

It is So Ordered.

---

9. After possibly seeing the writing on the wall after their request for an injunction was denied, plaintiffs filed in November of 1985 an identical complaint in state court. The present status of that case is not clear.

10. Defendants should not celebrate this decision. As mentioned above and to counsel in a pre-trial conference, they had a strong case for summary judgment, for which they should have moved long ago. Defense counsel's failure to do so most likely cost the town $16,000 for the settlements and the defendants' own attorney's fees.